UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VICKI MURPHY,                )
                             )
            Plaintiff,       )
                             )
      vs.                    )    05 C 3044
                             )
JO ANNE B. BARNHART,         )
                             )
            Defendant.       )

# MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

Plaintiff, Vicki Murphy, on behalf of her son Nathan Murphy ("Nathan"), seeks judicial review of Defendant's, the Commissioner of Social Security, final decision denying her application for Supplemental Security Income ("SSI") made pursuant to § 1614(a)(3) of the Social Security Act ("SSA"). Presently before the court are cross-motions for summary judgment filed by the parties. For the reasons set forth below, Plaintiff's Motion is denied and Defendant's Motion is granted.

# BACKGROUND

Nathan was born on December 9, 1992, and was discovered to be impaired at age nine. On November 20, 2001, Plaintiff filed an application requesting SSI to account for Nathan's Attention Deficit Hyperactivity Disorder ("ADHD") and

affective/mood disorders. Plaintiff's application was initially denied on May 20, 2002, and again when reconsidered on August 29, 2002. On October 18, 2002, Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"), which was held on March 24, 2004. At the time of the hearing, Nathan was 11 years old and in his appropriate grade level. Nathan had been receiving speech therapy and homework accommodations since September 1999.

The ALJ, prior to rendering a decision, heard testimony from Nathan, Plaintiff, Nathan's Stepfather, Raymond Murphy, and a medical expert, Kenneth Kessler, Ph.D ("Dr. Kessler"). The ALJ was also provided with Nathan's medical and school records.

**1.) Hearing Testimony**

Nathan testified that he was seeing his then current doctor, Robert M. Sholtes, M.D. ("Dr. Sholtes"), a psychiatrist at MacNeal Hospital and Family Practice, once or twice a month. He further indicated that he liked to play and watch video games, ride his bike without training wheels, take care of cats, and take the garbage out. He discussed a prior suicide note and an incident where he brought a knife to school. He testified that he had a problem paying attention when sitting too long and sometimes got mad and caused fights. Nathan had a cast on his right hand - that he broke while fighting with his sister - which was scheduled to be removed the day after the hearing.

Plaintiff, in relevant part, testified that Nathan exhibited behavioral problems both at home and school and at times, suffered from panic attacks. She further indicated that Nathan was taking medication for his impairments and had not been hospitalized since 2002. Plaintiff also discussed a Parent/Teacher Conference where she was told that Nathan had been disruptive.

Raymond Murphy testified that he had to restrain Nathan on occasion until he settled down and that Nathan had to remain busy or he was likely to become disruptive. Raymond Murphy further stated that when Nathan had anxiety attacks, he would "huff and puff" and grab at things that were not there. In addition, he indicated that Nathan walked in his sleep, was unaware of his actions, "blew up" more since taking medication, and had to be watched at all times.

Dr. Kessler reviewed Nathan's records and testified that Nathan had been diagnosed with, and medicated for, ADHD and Bipolar Disorder. Dr. Kessler noted that a review of Nathan's education records showed that he was in regular classes and having some problems. Dr. Kessler further indicated that he failed to find evidence of problems with Nathan's ability to move about. Dr. Kessler found that, based on the reviewed records, Nathan only had a marked limitation in the domain of "interacting and relating with others." However, Dr. Kessler further noted that additional records would be necessary to make a fully informed determination of the severity of Nathan's

limitation in the domain of "attending to and completing tasks." Dr. Kessler recommended that the ALJ obtain additional school records to better assess Nathan's condition before rendering a decision, which the ALJ did.

**2.) Medical and School Records**

On November 15, 1999, Nathan's first grade teacher, Lori Baez, requested a school district social worker evaluate Nathan's functioning at home and school using the Behavior Assessment for Children ("BASC"). Such an evaluation was performed, and the BASC revealed that Nathan had clinically significant or severe problems in multiple areas that possibly affected his educational functioning. The social worker recommended further evaluation for ADHD.

On August 23, 2000, Dr. Irving Rozenfeld ("Dr. Rozenfeld"), at the University of Illinois at Chicago Neurology Clinic, treated and diagnosed Nathan with ADHD and a learning disability. Dr. Rosenfeld noted that, prior to the consultation, Nathan had been taking Ritalin[1] which caused him to become "zombie like." Dr. Rozenfeld, in lieu of the Ritalin, prescribed a daily 10 mg dosage of Adderall.[2] Nathan's behavior

---

[1] A mild central nervous system stimulant often prescribed to children in conjunction with ADHD. David W. Sifton, et al., eds., The PDR Family Guide to Prescription Drugs, 164-65 (9th ed. 2002) (hereinafter "PDR Family Guide").

[2] An amphetamine that stimulates the central nervous system used to treat patients with ADHD. PDR Family Guide, at 15-17.

-4-

problems continued and, consequently, on November 27, 2000, the Adderall was increased to a 10 mg morning dosage and 5 mg dosage after school. Dr. Rozenfeld further noted that Plaintiff indicated she was applying for SSI benefits because she was unable to get child support from Nathan's biological father. By March 28, 2001, Nathan was sleeping and eating well, though Plaintiff complained that he was hyper-verbal. Dr. Rozenfeld increased the afternoon Adderall dosage such that Nathan was receiving 10 mg in the morning and 10 mg after school.

In April 2001, Marilyn K. Foster, M.S., Nathan's Speech/Language Pathologist, reported that Nathan began receiving speech therapy in September 1999. She further noted that Nathan's speech "disfluency" had improved from severe to moderate after resuming small group speech therapy.

On July 23, 2001, Dr. Rozenfeld noted that an evaluation by child psychiatry found that Nathan suffered from ADHD and conduct disorder. He further indicated that Nathan had fought, lied and shoplifted within the past 6 months; was in special education for reading; was slightly behind in math; and stuttered. In addition, Dr. Rozenfeld reported that Nathan was very distracted, even in a one-on-one setting, and that his behavior was worse at home than at school.

Dr. Rozenfeld's November 19, 2001, notes indicate that Nathan's teacher reported Nathan was having "staring spells" and had been aggressive, angry, and

argumentative after his morning Adderall dosage wore off.  Consequently, Dr. Rozenfeld adjusted the Adderall dosage to 30 mg in the morning and ordered an electoencephalogram[3] ("EEG") to rule out the possibility that Nathan was suffering from absence seizures.[4]  On January 12, 2002, Dr. Rozenfeld reported that, although the EEG indicated some abnormal wave forms, the abnormalities might not have been related to Nathan's behavioral problems.  In addition, Dr. Rozenfeld noted an incident were Nathan had choked his three year old sibling when told to "shut up," and, when consequently restrained, yelled "hit me/kill me."  Dr. Rozenfeld discontinued the Adderall because aggression is a possible side-effect of the medication and Nathan's aggression seemed to be escalating.

On January 25, 2002, Nathan was admitted to Riveredge Hospital for increasingly aggressive behavior and an intent to commit suicide documented in a letter.  Within 12 hours of admittance, Plaintiff requested that Nathan be discharged despite being advised that longer observation was necessary.  After 48 hours, Nathan's

---

[3] A device used to detect and record brain waves.  Webster's Third New International Dictionary, 732 (1981).

[4] Also referred to as a petit mal seizures, which are "temporary disturbance[s] of brain function caused by abnormal electrical activity in the brain and characterized by abrupt, short-term lack of conscious activity ('absence') or other abnormal change[s] in behavior."  National Institute of Health MedlinePlus Medical Encyclopedia, available at: http://www.nlm.nih.gov/medlineplus/ency/article/000696.htm.

attending psychiatrist, David Benson, M.D., found that Nathan did not present a safety threat to either himself or others and diagnosed ADHD, ruled out bipolar disorder and noted several stressors. When admitted, Nathan's global assessment of functioning ("GAF")[5] was rated 25, but upon discharge, he received a rating of 40.[6] It was found that Nathan had a good memory, fair judgment, early insight, an average to above average intellect and was oriented in all spheres. When discharged, Nathan was calm, alert, cooperative, made good eye contact and was less restless.

On April 20, 2002, Sonia Yballe, M.D. ("Dr. Yballe"), performed a psychiatric evaluation for the Bureau of Disability Determination Services and reported that Nathan had normal body activity; euthymic mood; denial of suicidal ideation; spontaneous, understandable and coherent speech; a normal thought process; was oriented in all spheres and had no memory deficits. Dr. Yballe diagnosed Nathan with ADHD and Oppositional Defiant Disorder, but ruled out bipolar disorder.

---

[5] The Global Assessment of Functioning is a numeric scale (0 through 100) used by mental health physicians to gauge "social, occupational and psychological functioning." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., text revision, 2000).

[6] A GAF rating of 25 indicates "behavior is considerably influenced by delusions or hallucinations" or "serious impairment, in communication or judgment" or inability to function in almost all areas." Id. Whereas, a GAF rating of 40 indicates "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Id.

The ALJ also reviewed a May 9, 2002, Childhood Disability Evaluation Form submitted by a non-examining state agency psychologist, Erika B. Altman, Ph.D., who reviewed Nathan's records. Dr. Altman found that Nathan suffered from Oppositional Defiant Disorder and ADHD, but ruled out bipolar disorder. Dr. Altman further concluded that, although impaired, Nathan's impairments did not meet, medically equal, or functionally equal the requirements of a listed impairment under the SSA.

On October 1, 2002, Dr. Sholtes began treating Nathan and diagnosed him with ADHD, a mood disorder, a neurological disorder and a possible partial complex seizure disorder. Dr. Sholtes initially prescribed Adderall and Depakote[7], and in November 2003, started Nathan on a new trial medication. By February 2003, Dr. Sholtes reported that Nathan was "ok" at school, but was not listening at home. It was further noted that Nathan was stealing, burning candles indoors and "getting into things." Consequently, Dr. Sholtes discontinued use of the new medication. In March 2003, Dr. Sholtes noted that Nathan's school had reported increased problems with organization, but remarked that Nathan had been less argumentative. At that time,

---

[7] Used to treat certain seizures and manic episodes. PDR Family Guide, at 200-202.

Plaintiff complained that Nathan was easily agitated after school. Dr. Sholtes prescribed an after school dosage of Seroquel.[8]

By May 28, 2003, Dr. Sholtes had taken Nathan off the Depakote and prescribed Lithium[9] instead. It was noted that, although Nathan had recently cut a hole in his mattress, no major outbursts had been reported since prescribing Lithium. On June 25, 2003, Dr. Sholtes reported that Nathan's sleep and mood were "ok," that irritability had decreased, and that Nathan was doing "ok" overall.

Due to reported "episodes of heavy, rapid breathing," Dr. Sholtes referred Nathan to Dr. Anchini, of the MacNeal Family Medical Practice, for an asthma assessment. Dr. Anchini noted on July 25, 2003, that Nathan indicated the breathing episodes occurred "almost only when things aren't going the way he'd like." Dr. Anchini believed the episodes were behavioral and would resolve themselves. Dr. Anchini recommended counseling.

On September 10, 2003, Dr. Sholtes reported that Nathan had gotten his homework done without any problems and was in regular school classes. However,

---

[8] An antipsychotic medication that combats schizophrenia. Id. at 614-616.

[9] Formally known as Eskalith and used to treat manic depression. Id. at 259-261.

Nathan's parents indicated that he had recently suffered from trance-like states and would smack his lips and repeat the same motion over and over.

On October 28, 2003, Sue Wolowitz ("Wolowitz"), Nathan's school case manager, found Nathan's overall academic skills and fluency with academic tasks to be in a low average range. She further noted that Nathan's performance in written language and expression was average; reading was low average; and math calculation was low.

By November 8, 2003, Dr. Sholtes noted that Nathan was doing well academically, had not had any particular problems in school and his stuttering had improved. Dr. Sholtes also reported that Plaintiff complained that Nathan's behavior varied widely. Dr. Sholtes' January 10, 2004, notes indicate that, although Nathan said that the Adderall helped his focus and his grades were "ok," Plaintiff reported that Nathan had been suspended from school for three days for bringing a pocket knife to school, had major outburst 2-3 times per week, and had broken his hand when he punched his sister. Dr. Sholtes prescribed Strattera[10] and reduced Nathan's Adderall dosage to 20 mg daily in an attempt to wean him off the medication.

---

[10] Generally prescribed for Attention-Deficit/Hyperactivity Disorder. Physicians' Desk Reference, 1784-85 (60th ed. 2006).

On January 13, 2004, Wolowitz reported that Nathan demonstrated a lack of insight for following rules and regulations. However, by November 2004, she noted improvement and reported that Nathan was in regular education classes in social studies, science, language arts and physical education, and special education classes in math and reading. She further indicated that Nathan had been nice and polite and that he liked to help, use tools and build.

On February 24, 2004, Ms. Kruse ("Kruse"), Nathan's 5th grade teacher, evaluated Nathan's behavior using the Vanderbilt Teacher Behavior Evaluation Scale in 34 behavioral areas on a scale of 0 (never), 1 (occasionally), 2 (often), and 3 (very often). Of the 34 areas, Nathan very often had behavioral problems in: 1) not following through on instructions, and 2) failing to finish school work and avoiding, disliking or being reluctant to engage in tasks requiring sustained mental effort. Nathan was rated as often having problems in seven additional areas and only occasionally or never having problems in the remaining 24 areas. Kruse further noted that Nathan sat back hoping to be unnoticed and seldom raised his hand to volunteer or participate. However, when called upon, Nathan's responses were usually on target.

### 3. The ALJ's Findings and Subsequent Action.

On September 16, 2004, the ALJ found Nathan's impairments did not meet, medically equal, or functionally equal any of the listed impairments and, consequently

denied Plaintiff's SSI request. Specifically, the ALJ concluded that Nathan had a "marked" limitation in interacting with others; a "less than marked limitation" in acquiring and using information and attending to and completing tasks; and no limitation in the other domains. In addition, the ALJ found that, although Nathan was credible, his parents were not fully credible. The ALJ's decision became the Commissioner's final decision on March 24, 2005, when the Appeals Council denied Plaintiff's request for review.

On May 20, 2005, Plaintiff filed an appeal of the Commissioner's final decision. On October 28, 2005, Plaintiff filed the instant Motion for Summary Judgment or Remand. Subsequently, on December 23, 2005, Defendant filed a Cross-Motion for Summary Judgment asking that we affirm the Commissioner's decision.

## LEGAL STANDARDS

### I. Standard of Review

Although denominated as motions for summary judgment, these motions are actually seeking a review of the administrative record. See generally Waldridge v. American Hoechst Corp., 24 F.3d 918, 921-22 (7th Cir.1994). The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching the decision and

whether there is substantial evidence in the record to support the findings. Scivally v. Sullivan, 966 F.2d 1070, 1075 (7th Cir.1992).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). A mere scintilla is not enough. Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995). Although we review the evidence in the record, the court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. Jones v. Shalala, 10 F.3d 522, 523 (7th Cir.1993). Even if there is adequate evidence in the record to support the decision, the findings will not be upheld if the "reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir.1996). The reviewing court has the power to enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## II. Supplemental Security Income Standard

Pursuant to 42 U.S.C. § 1382c (a)(3)(C)(I), to be considered disabled, a child must have a "physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 785 (7th Cir. 2003).

A three-step process is employed to decide whether a child is disabled. First, if the child is engaged in substantial gainful activity, his or her claim is denied. 20 C.F.R. § 416.924(a). Second, if the child does not have a medically determinable "severe" impairment or combination of impairments, then his or her claim is denied. Id. Finally, for a child to be considered disabled, the child's impairment(s) must meet, medically equal, or functionally equal the requirements of a listed impairment. 20 C.F.R. § 416.926(a). To decide whether the child's impairment(s) does so, the SSA, pursuant to 20 C.F.R. § 416.926a(b)(1), will consider how the child functions in six domains:

    i.    Acquiring and using information;
    ii.    Attending to and completing tasks;
    iii.    Interacting and relating with others;
    iv.    Moving about and manipulating objects;
    v.    Caring for oneself; and
    vi.    Health and physical well-being.

If a child's impairment(s) results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairment(s) functionally equals the listings and the child will be found disabled. 20 C.F.R. § 416.92a(d).

**DISCUSSION**

Plaintiff contends that the ALJ's determination that Nathan's impairment in attending to and completing tasks failed to meet, medically equal, or functionally equal the requirements of a listed impairment was against the substantial weight of the evidence. Plaintiff's contention is premised on the notion that ALJ erred in two respects: 1) by not contacting Dr. Kessler after receiving Nathan's school records that were not available at the hearing, and 2) finding that Nathan's parents were not fully credible.

**1. Whether the ALJ Erred by not Recontacting Dr. Kessler.**

Plaintiff submits that the ALJ erred by not recontacting Dr. Kessler to obtain his medical opinion as to Nathan's records obtained after the hearing. Plaintiff specifically argues that it was inconsistent for the ALJ to not recontact Dr. Kessler after adopting Dr. Kessler's opinions that were given at the hearing. Further, Plaintiff contends that the ALJ failed to consider the total record before him and, consequently, his decision is against the substantial evidence.

ALJs have the sole responsibility of deciding medical equivalence. 20 C.F.R. § 416.926(d). The regulations provide that the ALJ "will always base [his] decision about whether [an] impairment(s) is medically equal to a listed impairment on medical evidence only . . . [he] will also consider the medical opinion given by one or more

medical or psychological consultants designated by the Commissioner in deciding medical equivalence." 20 C.F.R. § 416.926(b). An ALJ is required to recontact a medical expert only if the evidence is inadequate to make a determination of disability and additional information is therefore required. See SSR 96-6p; see also Steward v. Bowen, 858 F.2d 1295, 1299 (7th Cir.1988).

Plaintiff wrongly contends that an ALJ must recontact and adopt the opinion of a medical expert on any additional piece of evidence they are presented with. It is clear the ALJ is only required to recontact medical experts where clarification of the evidence is necessary. Steward, 858 F.2d at 1299. Although Plaintiff submits that the ALJ's decision was against the substantial weight of the evidence, her arguments do not show that the updated school records required any type of clarification. Plaintiff, in making her argument, specifically points to Ms. Krause's evaluation report indicating that Nathan had difficulties giving attention to and completing tasks to support her notion that Nathan's impairment equaled the listed impairment. However, in making her argument, Plaintiff chooses to ignore the conflicting evidence also contained in that report, specifically that: the evaluation rated Nathan in 24 additional areas as never or only occasionally having behavior problems; he completed his homework but left it at home; and that he tended to not volunteer answers in class, but when called upon, was usually "on target." Upon a review of the school records

acquired after the hearing, it is evident that no additional medical opinion is necessary to dispel any confusion and, therefore, the ALJ was not required to recontact Dr. Kessler before considering it. Further, coupled with the other evidence in front of the ALJ, the additional school evidence fails to show that the ALJ's decision was against the substantial evidence.

Plaintiff also asserts that the ALJ failed to fully consider Dr. Sholtes' medical records. Although Dr. Sholtes' notes were not part of the hearing record, it is evident that the ALJ considered them. Throughout the opinion, the ALJ references Dr. Sholtes' findings which, as a whole, do not deviate from the representations found in Nathan's other medical records. Like Nathan's earlier medical records, Dr. Sholtes' notes indicate that Nathan clearly had behavior problems. However, the notes also reveal that Nathan got progressively better when on medication. Consequently, the ALJ properly considered Dr. Sholtes' records when formulating his ultimate decision to deny Plaintiff's SSI request, which was supported by the substantial weight of the evidence.

**2. Whether the ALJ Erred in Rendering his Credibility Finding.**

Next, Plaintiff argues that the ALJ erred in finding that Nathan's parents were not fully credible. ALJs have the opportunity to personally observe the demeanor of those testifying at the hearing and, therefore, generally we must defer to their

credibility determinations. Brown v. Barnhart, 298 F. Supp.2d 773, 793 (E.D. Wis. 2004). Thus, we will not disturb the ALJ's credibility determination unless it is patently wrong. Luna v. Shalala, 22 F.3d 687 (7th Cir.1994). But, as always, the ALJ must abide by the Commissioner's Rulings and Regulations in making his findings; specifically the reasons behind credibility evaluations must be articulated and grounded in the evidence. Brown, 298 F. Supp.2d at 793; SSR 96-7p.

Plaintiff submits that the ALJ failed to support the credibility determination with adequate evidence. The ALJ, in discussing Nathan's parents lack of credibility, specifically relied on one of Dr. Rozenfeld notes indicating that Plaintiff was applying for SSI because of problems in getting child support, and one of Nathan's past teachers who indicated, in contrast to Plaintiff's assertions, that Nathan got along with his peers and teachers. We are not here to sit in judgment of the ALJ's credibility determination where the appropriate regulations for rendering such a finding was followed. Essentially, Plaintiff asks us to reweigh the evidence presented to the ALJ. As previously noted, we will not do so. Our review is limited to looking to see that the ALJ has supported his determination with evidence and not merely posited an unsupported conclusion. In the instant case, the ALJ rendered a credibility determination and supported it with evidence from the record. Therefore, we find that ALJ did not err in holding that Nathan's parents were not fully credible.

## CONCLUSION

For the reasons set forth above, Defendant's Motion is granted and Plaintiff's Motion is denied.

*[signature: Charles P. Kocoras]*

Charles P. Kocoras
Chief Judge
United States District Court

Dated:   March 24, 2006